All right, next case on the docket is Peeble v. Nitz, clause number 5-11-0271. Mr. Burke, you may proceed, sir. My name is Robert Burke. I'm with the Office of the State Appellate Defender. I represent the defendant appellant, Richard Nitz. We're asking this court to remand this case for further post-conviction proceedings. In this case, I'm going to be talking about three brothers. Bart Masters, Brett Masters, and Mark Masters. I did not mean to be flippant. Those names remind me of the TV show, Maverick, when I was a kid. There was Bart Maverick, Brett Maverick, and then a Maverick from England. I don't remember his name. To keep them straight, I have identifiers. The main brother I'm going to be talking about is the jury foreman Masters, Bart Masters. The body in this case was found down in Union County by the brother, Brett Masters. They'll call him Union County Masters. When the case began, it was a Union County case. The sheriff who was summoned was Robin Dillon, down in Jonesboro. At first, they didn't know who killed this man. All they know is that this group of kids phoned it in. During the investigation, they found out that the decedent was homosexual. That opened up the investigation a little bit further. That's when they interviewed the third brother, Mark Masters. They interviewed him about whether the decedent had a bar in Carbondale the night that he disappeared. The name of the bar was Two Hearts. They also interviewed him about the decedent's homosexuality and whether he and Mark Masters had sex with the decedent. I'm going to call him Two Hearts Masters. So this all is in the spring of 1988 when jury foreman Masters apparently was still in New Orleans. But I'm thinking about Thanksgiving of 1988 and how that must have been an interesting conversation at the Thanksgiving dinner table when the family got together. Do we know they got together? No. Is there anything in the record that they even saw each other on Thanksgiving? Not a bit, Your Honor. Go ahead. Thank you, Your Honor. Just wondering. Yes, I'm just assuming it. And I assume that as years went by... Should we assume that the three brothers had a conversation on Thanksgiving? No, Your Honor. Go ahead. The years go by, Mr. Nissen is found guilty, there's some appeals. It finally goes back for another trial ten years later. In that case, jury foreman Masters was in the denier. When he was then questioned, he was questioned by the state's attorney down there who asked him, now isn't your brother Brett the one who found the body in Union County? And he said, yes. And they examined him about that and said, is there anything that's going to... about that and him finding the body and everything that's in the police report, anything about that that's going to cause you to be biased? Jury foreman Masters said no. Then the question was, are there anybody in your family who has cases? And they started to talk about his brother, Mark Masters. The state's attorney then changed the subject and never asked him about Mark Masters. The defense attorney, John O'Hare, also did not ask him about Mark Masters, even though it was a discovery. So there's another finding of guilt, a sentencing, a letter gets written that was the subject of the last appeal, and then ultimately it was sent back for a post-conviction hearing to find out if jury foreman Masters was being truthful when he said that he was unbiased. When it went back, still no one ever brought up the fact that there were these police reports about two parts of Masters. Do you have a question? No. The post-conviction hearing was conducted by Tim Capps. Apparently also there was Chuck Sheedle, who's here today, and Aviva Futorian. I assume that Mr. Capps was in charge. I think whoever's asking the questions is in charge. But he did not file a 651C certificate, and he did not seem to know what was in the record. So it comes up on appeal, and I raise an issue, hey, there's no complaints with 651C. The state has filed some motions, one of them to dismiss the appeal because there's no post-conviction petition. Now the other grounds for the appeal was that because there was no post-conviction, now there is a post-conviction petition, but at the time there was not one before the circuit court when they were conducting the hearing. So the state's second argument in that motion is that because they did not have a document beholding the hearing, then the judgment order is void. If that's the case, then it needs to be remanded with instructions. We told you to hold a hearing on this. Hold a hearing on this now that it's in the record. And I'm fine with that. I'm asking that it be sent back for a hearing. So you want us to grant the state's motion to dismiss? If it's based upon a void order, yes, Your Honor. The state filed a motion to supplement Aviva Futorian's certificate into the record. I filed a motion to supplement in three affidavits. Aviva Futorian's affidavit saying that she wasn't aware of these police reports about Mark Masters and had she known, she would have told Tim Papps. And the affidavit of Chuck Sheeto saying I wasn't aware that this was in the record and if I had known, I would have told Tim Papps. And then the affidavit of Richard Nitz saying nobody asked me nothing. That whole motion is still pending. The state's motion to supplement with Ms. Futorian's 651C certificate was granted. What's good for the goose is good for the gander. If you're going to grant that motion under the case law, you have to grant my motion. That then raises a question of fact about whether there was compliance with 651C which requires a remand. So whether it was a void order that requires a remand or there's a competing certificate and affidavits that requires a remand or if you just look at the case and see that nobody ever asked the three former Masters about whether he would be biased in any way in this case about homosexuality in Southern Illinois if one of the potential witnesses was his brother. Two parts Masters. He did not actually testify at the trial. That's correct. That's correct. I'm not for sure that anyone on the defense side even knew that he was a witness. They certainly didn't ask about it at voir dire. And so since 1998, there's been this question out here that was avoided during the voir dire about Mark Masters, about two parts Masters and about how jury forming Masters felt about his brother being involved in this case due to homosexuality and whether he was going to be biased and fair in that kind of situation. That's why we're asking that it be sent back for a hearing. It doesn't matter if it's void, send it back for a hearing. Competing affidavits, send it back for a hearing. If there's no compliance with Section 51C, send it back for a hearing. That's the relief that we're asking for. Are there any questions? Thank you, Mr. Burke. Shanahan? May I please report? Counsel. My name is Sharon Shanahan and I represent the people of the state of Illinois. As defense counsel touched upon just briefly at the end of his argument, this is an unusual case because this court gave defendant Lee to file a successive post-conviction petition, but he didn't file it. So the state... Well, this court reversed the denial of Lee to file a successive... Our actual order says, for the foregoing reason, this court's denial of Lee to file a successive post-conviction petition is reversed. Correct. And the case is remanded for further proceedings under that. In the case of successive post-conviction petitions, there are two things that have to happen. You can't just go file your motion. First, you have to meet the cost of credit assessment. We're pretty much saying here it's fine. No, you're not. You're saying that... That's not what we said. Not at all. It says that if so, tell me what was it. Because you didn't know until I filed the motion to supplement. Tell me whether the trial court was correct in its ruling. I don't know. You didn't know because you couldn't look at the petition and see what the petition alleged. Didn't everybody, though, at the trial level, after the remand, it was discussed. Absolutely. Each of you have quoted from the record and so forth. Everybody knew what they were talking about. It was this successive petition, this very one. This is what we're going to proceed on. And even though we reversed and said file it, you're saying because the defendant never said, I now move again. No, all he had to do... All he had to do was walk into the circuit clerk's office and have it stamped. That's all he had to do. And then it would have been in the record. I'm sorry. So what does it mean then, you know, we dismiss? Mr. Burke says, well, then it's got to go back for a new... This court said that the defendant had met the cause and prejudice test. And that means he's allowed to file a petition.  So they get their new hearing they want if we grant your motion to dismiss? That's what's so unusual about this case. We're all asking for the same thing. Everybody wants us to grant the state's motion. Well, I hope my opponent's right. I hope that you do have jurisdiction. I'd love for this court to find jurisdiction. I don't think it's there. I certainly, I mean, I can tell you that no one on the state's side wanted to file a petition, I mean a motion, saying dismiss this case and send it back. I felt obligated to file it because I don't think that a trial court can have a hearing on a petition that is nowhere in the record. I don't think any review by this court can come of this successive post-conviction petition. Let me just talk again. The petition is in the record. It's just, you know, it doesn't, it was never filed. It is now in the record as a result of my motion, yes. The purpose of that being that I think that if this court finds jurisdiction, and if this court proceeds to the issue of the brothers, which, by the way, I have a simpler identifier for, I'm going to use their names. If you reach that issue, then you need to know what's in that petition. And you need to know what's in that petition in order to reach the motion taking with the case about the 651C certificate. And I'll touch on that briefly right now, because what a 651C certificate says is that you have, that the attorney has raised all the issues that the defendant wants raised, all the constitutional issues. And you don't really even, unlike a 604D, you don't really even have to have the certificate in there if this court can look at the record and see compliance. Now, the thing that the defendant is complaining about in this case is the two brothers, Brett and Mark. And you know, I hadn't even thought about those being the names of the mavericks, but that's what he's complaining about, is that Attorney Cass, at the post-conviction hearing, should have asked Bart about his two brothers. That's not something that needed to go in the 651C petition. That's not something that needed to go in the post-conviction petition. Those are facts which could have been brought out at the hearing to prove the allegations of the post-conviction petition. Ms. Futorian, by the way, Ms. Futorian has been counsel for Mr. Nitz since, I don't know exactly, but she was the attorney who filed and argued and won his first post-conviction petition, which gave him his second trial. So there's nobody that knows more about this case than Ms. Futorian. Her affidavit says that if she had known about Mark Masters, she would have provided the information to Tim Capps to use in his examination. That's not something that goes in a post-conviction petition. The 651C certificate that she filed that says every issue that the defendant wants to raise was raised. These are facts that might, our defendant argues, have helped prove his petition. Same thing with Mr. Scheidel's petition. He says the same thing. He says, I would have suggested that Bart be questioned about any knowledge he had regarding contact between his brother and Mr. Meinle. So, it's nothing to do with the petition that was filed. You can look at the petition. That's why, one of the reasons I've asked that this court grant the motion to supplement the record. So I will move on, unless there are any other questions on those two issues, to the two brothers. Brett, one of over a dozen people who I've always assumed these guys had to just be having kind of a drunken party. I don't know that. That's definitely not in the record. But they're shooting BBs at this car. They're throwing rocks at it. As in, somebody gets the bright idea to turn it over. And they did. I bet they sobered up very fast. So, they take fingerprints of everybody, everybody that was there. Some of them were on the car. Bill Lotus, his fingerprints are on the car. And it's interesting, when you look at the reports, the fingerprints are on like each, the bumper, the front fender, the back fender, and the roof. Just like three men would push a car over. That's what elimination prints are. Elimination prints are prints that you say, this person had a reason to be there. So he's not a suspect. Now, let's see who else's fingerprints are there. Mr. Miley's prints, I assume, were probably taken post-mortem for elimination purposes. Anybody, you can say, of course, it's reasonable that their fingerprints are there. So, he was not a suspect. He was never a suspect. Nor was Mark. Mark was one of more than 130 people that the police officers of Carbondale, Illinois, interviewed. Most of those people were members of the gay community. They were asking, when this case started, they didn't have any idea where to look. So they went to the gay community. They interviewed people that went to Two Hearts Bar. They interviewed people that went to this place called Big Tahiti. Big Tahiti is the place where Michael Miley was last seen alive. Michael Miley was never at Two Hearts Bar the night he was murdered. But they just wanted to find out, they wanted to find out more about Michael Miley. They wanted to find out, is there anybody that's giving the gay community a hard time? That's what they did. And so, of these 130 some odd interviews, I'm guessing that more than 100 of them were gays in the community. And they just were asking for information. They were not interviewing suspects. And the only thing Mark Miley said was, yes, I saw him at the bar sometime. I didn't know him well. I thought he was promiscuous. Interviewed extremely in brevity and in concern with the other dozens and dozens of gays that they talked to. And it's interesting that it was in the process of, they also, the police officers also went out to Big Tahiti and they parked their cars so that they could talk to the gays that came there and say, has anybody been giving you a hard time? They picked up some information that somebody was coming to Big Tahiti with baseball bats, breaking headlights, breaking windshields, but they didn't know, have any idea who it was. So they're going out to Big Tahiti for the same reason. Has anybody been giving you a hard time? And if I could finish my sentence, thank you. It was when they were doing that that Richard Mitz wore it onto the scene and his presence there was what initiated the first suspect in this case. Any questions? Thank you, Ms. Shannon. Anybody? Your Honor, unless there are any questions, I don't have any. I'm just asking this court to do what the parties ask. Thank you. Thank you both for your briefs and your arguments and the voluminous motions you filed in this case. We're going to sort all this out and enter a decision in due course.